ROORBACH and BARTHOLOMEW *against* DALE and others.

THE SAME *against* THE NORTH RIVER STEAM-BOAT
COMPANY.

The masters of the *North River* steam-boats, in whose names con-
tracts have been made with the *Postmaster General*, for carrying
the mail between the cities of *New-York* and *Albany*, are not en-
titled to take the profits of the contract to their own use and benefit,
without the consent of the owners of the boats : nor is the contract
to be considered as made with the captains personally, for they are
the mere agents or servants of the owners, liable to be discharged
from their employment ; and the owners have a right, at any time,
to demand from them an assignment of the mail contract, and take
the profits thereof, without making any compensation to them for
it, further than they have specially engaged to do, by the express
terms of their appointment, or contract.
It is not competent to the captains of the boats to object to the legality
of an assignment of the mail contract by them to the owners. Nor,
after having consented, and continued to receive an additional salary
for their services, in lieu of all fees and perquisites for carrying the
mail, or commissions for collecting the steam-boat tax, can they,
afterwards, claim any share of those perquisites and commissions.

THE first bill was filed, by *R.* alone, against the indi- *December* 24.
vidual owners of the *Hudson*, or *North River* steam-boats,
previous to their incorporation, under the act of the 10th of
*March*, 1820. *B.* was, afterwards, made a plaintiff, and
*Wiswall* a defendant. The second bill was filed against
the corporation. The facts were the same in both, and the
answers were similar.

The plaintiffs stated, that in *May*, or *June*, 1809, the
plaintiff, *R.*, was engaged, by the late Messrs. *Livingston*
and *Fulton*, as captain of a steam-boat, on the *Hudson
River*, and that he continued in command of such boat
until their deaths, and had gained their confidence. That

*L.* and *F.* intimated to *R.* a design to obtain a contract for carrying the mail of the *United States,* between *New-York* and *Albany,* in the names of the captains of the boats, and that the profits should enure to their benefit. That after the death of *L.,* one of his heirs applied to the Postmaster General, for that purpose, and *R.* wrote letters, and took steps, to procure the right of carrying the mail. That in 1815, an act of Congress was passed, authorizing the P. M. G. to contract with the captains of steam-boats for carrying the mail. That though this law was general, it was passed in reference to the *North River* steam-boats; and that on the 30th of *March,* 1818, a contract in writing was made between the P. M. G. and *R.,* in behalf of himself, the plaintiff *Bartholomew,* and *S. Wiswall,* the captains of the *North River* steam-boats, personally, and not as agents, and for their own exclusive benefit; and that, in pursuance of this contract, the captains carried the mails in their boats, and duly accounted to the P. M. G.; and that, after the expiration of the contract, *R.,* in behalf of himself and the other captains, on the 19th of *December,* 1815, wrote to the P. M. G. for a continuance of the contract, and which was accordingly continued, for another year, on the same terms. That in *April,* 1816, the owners of the boats interfered, and proposed to the captains to increase their salaries from 1000 to 2000 dollars, and the owners to receive the profits of the contract for carrying the mail. That the captains acceded to the proposal, and commuted the profits of the contract for the salary of 2000 dollars, which the defendants paid, and received the profits of the mail contract. That this allowance was intended to be permanent, and in consideration of the advantages of future mail contracts. That, afterwards, in *April,* 1817, the defendants, by a *resolution* of the Company, unjustly and fraudulently reduced the salaries of the captains to 1500 dollars. That the allowance of the 2000 dollars was made fraudulently, with a view to obtain

from the captains a surrender of the mail contracts. That the captains sent to *R. L. L.*, the president of the steam-boat company, a notice of their remonstrance against the reduction of their salaries. That the defendant, on the 27th of *April*, 1819, wrote a letter to the captains, demanding the delivery of the existing contract for carrying the mail, and another letter on the 20th of *May* following. That on the 18th of *June*, 1819, the plaintiff signed a paper, purporting to be an assignment of the mail contract to *D. Lynch*, for the use of the company, and which assignment remained in their possession. The bill charged, that the mail contract was a personal trust in the captains, and not assignable by them, without the assent of the P. M. G., which was not obtained; and that the assignment was fraudulent and void, and executed by the plaintiffs under a mistake of the law. That the plaintiffs signed receipts for their salaries, but always with the verbal reservation to *A. N. Hoffman*, the clerk of the company, of their right to salary of 2000 dollars, or to the profits of the mail contracts. That on the 15th of *April*, 1817, the legislature laid a tax for each passenger in the steam-boats, for collecting which the captains were, by the law, allowed three per cent., which allowance was unjustly claimed by the defendants; and on the 29th of *May*, 1817, the defendants agreed to allow the captains 1750 dollars per annum; but the captains to account to the company for the commissions, which was a fraud on their rights. That the boat commanded by the plaintiff, *R.*, was lost by unavoidable accident, and the defendants have not given him another, though they exonerated him from blame; and have since employed another captain. *Prayer*, for an account, and that the plaintiffs may be decreed their due proportion of the profits of the mail contracts, and the commission on the steam-boat tax collected; and that the assignments and receipts may be cancelled, and for general relief.

1822.

ROORBACH
v.
N. RIVER
STEAM-BOAT
COMPANY.

. 1822.

ROORBACH
v.
N. RIVER
STEAM-BOAT
COMPANY.

Answers were put in, and proofs taken in the cause. The material facts are stated in the opinion delivered by the Court.

*November* 19.  The cause was brought to a hearing on the pleadings and proofs.

*J. Woodward*, for the plaintiffs.

*T. A. Emmet, P. A. Jay*, and *Slosson*, for the defendants.

THE CHANCELLOR.    The bill claims a right to an account of the profits of the contract for carrying the mail, made with the Postmaster General, on the 24th of *February*, 1819.   It was made by *Wiswall*, one of the defendants, on behalf of himself and the two plaintiffs, and was to continue for four years.    *W.* says, that when he procured the contract, he presented a letter on the subject from Mr. *Lynch*, the secretary to the company, and, he understood, that the avails of the contract were to go to the proprietors of the boats.

This contract was, afterwards, on the 18th of *June*, 1819, assigned, by *Wiswall* and the two plaintiffs, under their hands and seals, to the owners of the boats ; and the assignment was of all their right and interest therein, and of all the moneys due and to grow due thereon.   The contract was delivered with the assignment, and, since that time, the compensation, under the contract for carrying the mail, has been paid by the government of the *United States*, through the Postmaster at *New-York*, to the receiver and agent of the company, under the assignment ; and the charges and expenses of transportation have been borne by the company.   There was no condition annexed to the execution and delivery of the assignment ; and Mr. *Rhind*, who was present as a witness, says, it was fairly

procured, and freely executed. *W.* says, that he executed and delivered the assignment of the contract understandingly, and he believed it was obtained from the other captains fairly, without compulsion.

If this assignment was fairly obtained, and freely given, it puts an end to the claim. There is nothing in the case to contradict this testimony of *Rhind,* and of *Wiswall,* one of the parties. The captains were competent, moral agents, and free to resist the demand of the assignment of the mail contract, if they deemed it contrary to their interest, or their duty to comply; and the defendants had an equal right, (except so far as they were bound by some previous contract,) to prescribe the terms upon which they would appoint or retain the captains in their service. The rights of each party were reciprocal and perfect. The one had a right to prescribe the terms, and the other to assent or retire. There is no doubt, that the assignment of the contract was in consequence of the demand of Mr. *Lynch,* the secretary of the company; and that demand was founded upon the resolutions of the company, of the 5th and 20th of *May,* 1819, requiring him to make it. But the company most clearly had a right to insist upon the delivery of the contract to them, and that the plaintiffs should consent that they should reap the profits, when the mail was carried by the company, in their own boats, running at their own expense and hazard. I cannot well conceive of any proposition more unjust and absurd, than that which should contain the doctrine, that the captains of the boats, who were the mere agents and servants of the company, had a right to continue in the service of the company, and to transport the mail in the boats, and take the profits to themselves, against the will and consent of the owners of the boats.

The plaintiffs contend, and they make it the basis of their demand, and the ground of their complaint, that the owners of the boats entered into a contract with them, in

1816, to give them each 2000 dollars a year, as a salary, in consideration of a surrender of the profits of the mail contracts. There was a resolution of the company, of the 17th of *April*, 1816, giving to each of the captains " a salary of 2000 dollars *per annum ;*" but this resolution contains no reference to the mail contract, which stood in the name of the plaintiff, *Roorbach,* and had been made by him with the Postmaster General, for the year 1816. Nor does this resolution bind the company to continue either of the captains in their service, for any definite period, or longer than they should think proper ; nor does it conclude them from altering the amount of the allowance, if the interest of the establishment should, afterwards, in their judgment, require it. The most liberal construction that the resolution would admit of, would not oblige the company to continue the captains, or that salary, beyond the then current year ; for the mail contract, which is said to have been the cause of increasing the salary, at that time, from 1000 dollars to 2000 dollars, was only for that year. The plaintiffs, however, rely upon parol testimony, to give another and a stronger construction to the resolution. *Anthony N. Hoffman,* who was, at that time, clerk to the board of proprietors, and who had conversations with Mr. *Lynch,* the secretary of the board, says, it was his understanding, at the time, that the captains and the company had agreed, that the salary of 2000 dollars per annum, was to continue, as a fixed salary, as long as the captains could maintain the mail contract. But, Mr. *Hoffman's* conversations with Mr. *Lynch,* and with the captains, are not evidence of a contract, binding on the proprietors ; and Mr. *Lynch,* in his answer, denies (and so do all the defendants) that the salary was intended to be permanent, or longer than the year, during which the mail contract, then in force, was to continue.

There is, evidently, no testimony to change the legal operation and effect of the resolution, or sufficient to coun-

teract the force of the answers on this point. Nothing can be more unfounded, than to set up a verbal contract, in 1816, deduced from inferences drawn from private conversations with one or two unauthorized individuals, as a claim against the company, for the allowance of that salary, down to the filing of the bill, or, as a substitute for it, a claim for the mail profits of the contract of 1819, down to the termination of it, at the end of the four years. If any such verbal contract existed, it has been, again and again, waived by the captains, and the modification of the allowance, and the surrender of the mail profits, admitted and assented to, by repeated acts of the plaintiffs. Thus, in *February* and *April*, 1817, the salaries were reduced to 1500 dollars, and, again, in *May*, 1817, raised to 1750 dollars, by resolutions of the proprietors; and the captains all voluntarily continued in the service of the defendants, and accepted of those modified sums as a compensation for their services, and in full for all their fees and perquisites, as agents for carrying the mail, and collecting the steamboat tax. These repeated acts of recognition, of the variations of the salary, and of the taking of those perquisites and profits, by the owners of the boats, and the final act of the voluntary assignment of the mail contract of 1819, constitute an insurmountable defence to the whole of the present demand.

It ought not to be forgotten, in the consideration of this case, that it, of right, belonged to the defendants, as owners of the boats, to employ whom they pleased, at what price, and upon what terms they pleased, in their sound discretion, and that their agents and servants were always at liberty to accede to the terms, or to reject them, and quit the employment. This right always did, and always must exist in full force, except so far as it may be abridged in the given case, by positive compact; and there is nothing in the present case that impaired the exercise of this right, on the part of the owners of the steam-boats, or ren-

dered the resolutions, which they, from time to time, passed on the subject, unlawful or unjust.  The permission granted by the proprietors of the boats to the captains, to carry the mail and take the profits, in 1815, was gratuitous, and rested entirely in their consent and good will.  And, if it were to be admitted, that the defendants had no right to reduce the compensation of 1000 dollars *per annum*, for the service of the captains, in carrying the mail, the other moiety of the 2000 dollars was evidently an allowance for *wages*, which they were not bound to continue beyond the year.  The reduction from 2000 dollars to 1500 dollars, which was made in 1817, may, therefore, if it were at all necessary, be placed by the defendants to the account of wages for services of the plaintiffs, strictly as captains, and this would render the resolutions of 1817 no longer obnoxious to the charge of a breach of contract.

Much stress seems to have been laid upon the circumstance, that the Postmaster General intended to contract with the captains, and for their personal benefit, and that the contract was personal, and not capable of assignment. It would seem to be a sufficient answer to this objection, that the captains, having made the assignment, are estopped from denying its validity ; and the government of the *United States*, through their Postmaster at *New-York*, was informed of the assignment soon after it was made, and its validity has been recognised by the uniform payment of the compensation, at stated periods, to the assignees, claiming it in that capacity.  It must, also, have been known to the government, that the captains were the mere servants of the proprietors of the boats, and that the mail could not be carried without their consent, and that the captains held their appointments during pleasure.  There can be no doubt, that the post-office department must, of course, have considered the proprietors as interested in the contract, and that, as the actual performance of the duties incident to the mail, must, of necessity, devolve upon the captains,

or other servants of the company, even if the contract had been made nominally with them, the captains were proper persons with whom directly to contract, *under the previous consent of the owners.*

I have hardly thought it necessary to take notice of the suggestion, that the receipts for the salaries were constantly given to Mr. *Hoffman*, on behalf of the company, under a verbal protest against the reduction of the salary, or a mental reservation of claims to the mail profits. Such reservations are idle and void, as well upon legal as upon ethical principles; it would go to destroy all sincerity and all confidence in dealing, if men could escape from the binding force of their acts and obligations, by such means.

The bill also claims an account of the perquisites allowed, by law, to the captains, for collecting the tax on steam-boat passengers; but the objection to this demand is equally conclusive. The captains were, on the 10th of *May*, 1817, allowed an addition, of 250 dollars a year, to their salaries, as an equivalent for this perquisite, and they accepted of the commutation, and it was paid to them, and they regularly accounted for the perquisite.

The plaintiff, *Bartholomew*, was dismissed from the service of the defendants, as a captain, in *March*, 1821; but previous to his dismissal, he and the defendants settled, and the balance of his account was paid to him, and he gave a receipt in full of all demands on the defendants, as a corporation or otherwise, and in satisfaction "of all claims and demands whatsoever, by reason of any account, contract, promise, or any thing whatever, for which the company, or the members thereof, as a corporation or otherwise, were or are liable." This discharge, in these sweeping terms, was given by Captain *B.*, as Mr. *Rhind* says, without any objection, after reading it, and without suggesting any claim on account of the mail. It shows, then, that the claim on his part is, if possible, still more groundless. It may also be observed, that the plain-

ROORBACH
v.
N. RIVER
STEAM-BOAT
COMPANY.

tiff, *Roorbach*, was dismissed, by a resolution of the pro-prietors, of the 28th of *February*, 1817, and which, at the same time, reduced the salaries to 1500 dollars; and when he was restored, by the resolution of the 14th of *April*, 1817, and assigned to the command of the *Paragon*, the same allowance of 1500 dollars only, and a prohibition of all perquisites to the captains, was declared. By accepting of a re-appointment under this last resolution, he certainly ought to be considered as acceding to the condition annexed; and I cannot well imagine a case, in which a party is more strongly concluded from advancing any pretension to other terms.

The plaintiffs have, by their counsel, claimed from the defendant, *E. P. Livingston*, his proportion of the 2000 dollars, salary, on the strength of a letter which he wrote to Captain *W.*, on the 11th of *May*, 1819, in which he stated, that he should advocate the increase of the salaries to 2000 dollars, from the 1st of *January*, 1819, " and should it not obtain the assent of a majority, he would, at all events, pay his proportional part of such increase, so long as their conduct and the proceeds might, in his opinion, justify it." Whatever might otherwise be the deductions to be drawn from this paragraph, it is in proof, by the certificate of Mr. *Hoffman*, that the captains declined to accept of this offer, as they did not deem it honourable to receive such a partial allowance from one of the concern.

I am, accordingly, of opinion, that there is no just foundation for the suit, and that the bill ought to be dismissed. And considering the absence of all reasonable colour and ground for the claims set up, and that the bill has been permitted to contain numerous and injurious charges of fraud, without any colour of proof to support them, I feel myself under the necessity of adding, that the bill be dismissed with costs.

Decree accordingly.